UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI

| | |
|---|---|
| IN RE: LEXAPRO AND CELEXA PRODUCTS LIABILITY LITIGATION | § § § § § § § |
| THIS DOCUMENT APPLIES TO: ALL ACTIONS | |

MDL No. 4:06-md-01736-RWS

## PLAINTIFFS' MOTION FOR SANCTIONS

In spite of the Court's admonitions, and the best efforts of the undersigned to avoid further motion practice relating to the deposition of Forest CEO Howard Solomon, this motion has been necessitated by the actions of Forest's counsel.  Regrettable the Court must now weigh in on this issue once again because it is necessary to obtain clear, admissible testimony for use by all of the transferor courts on remand of these consolidated cases.  To that end, Plaintiffs would respectfully show the Court the following:

1. On September 28, 2012, this Court denied Defendant's motion to quash the deposition of Forest's CEO, Howard Solomon, because Mr. Solomon "obviously has some personal knowledge or at least has some understanding of some issues relating to this case….". Exhibit A at 4:8-5:3 (Court transcript dated September 28, 2012).  In doing so the Court cautioned both sides that "there's no cause to call me during the course of the deposition if somebody is overstepping the bounds or interposing too many objections because I will deal with that in a motion for sanctions after the deposition if someone tried to abuse the -- on either side of the table -- abuse the deposition in some fashion." *Id*. at 5:12-5:19.

2. Subsequently, after receiving Plaintiffs' deposition notice and document requests for Mr. Solomon, Defendant filed a Motion, and related Memorandum in Support, for a Teleconference with the Court regarding the deposition and document production. Exhibit B (Doc. #639).  Therein, Defendants repeatedly and strenuously argued that "fairness" dictated that

Mr. Solomon <u>must be allowed to review</u> the documents Plaintiffs' were planning on using in his deposition <u>prior to his deposition</u> so that he could "be prepared" and the deposition could proceed more "efficiently:"

> "…it is appropriate for any fact witness to be given advance notice of the topics to be discussed for the sake of **efficiency and as a matter of fundamental fairness**." *Id*. at 1.
>
> "Forest asked plaintiffs to identify, in advance of Mr. Solomon's deposition, the documents about which Mr. Solomon would be questioned, to allow Mr. Solomon a **meaningful opportunity to prepare**." *Id*. at 4.
>
> "In light of the volume of documents in this case, it is unreasonable to expect that any Forest employee, but particularly its CEO, will be able to **prepare adequately for deposition** about business matters stretching back over a decade without some indication of the topics to be covered and the documents to be discussed." *Id*. at 6.
>
> "Regardless, **fairness and efficiency dictate** that Mr. Solomon be given an opportunity to review the documents about which he will be questioned in advance." *Id*.
>
> "The Court has established a presumptive limit of two hours for Mr. Solomon's deposition. **Little may be accomplished** if Mr. Solomon has to examine and attempt to recall whether or how he was involved in, or has knowledge of, the issues addressed in each document. Given the fact that the relevant events stretch back well over a decade, that also would be **patently unfair** to Mr. Solomon." *Id*. at 7.
>
> "Moreover, if any prospective deposition exhibits are provided in advance, Mr. Solomon will have an opportunity to familiarize himself with the documents and likely **will be more prepared to answer questions** about a particular exhibit." Lengthy pauses will be fewer, and the time available for the **deposition will be used efficiently**." *Id*.
>
> "District Judge William Wilson addressed this very issue in the Prempro MDL. In that similar circumstance he ordered plaintiffs' to identify the documents that would be used as exhibits in advance of all depositions. Here, Forest **seeks that courtesy** with respect to a deposition that plaintiffs represented would be short and simple." *Id*. at 8.
>
> "Finally, **fundamental fairness** dictates that Mr. Solomon be provided with the documents that will be used as exhibits at his deposition in advance of his deposition. That will allow Mr. Solomon to **prepare effectively** for his deposition,

ensure plaintiffs will comply the limits of the deposition established by the Court, and **make the deposition itself quicker and more efficient**." *Id*. at 9-10.

3. In response to Defendant's Motion, and prior to Plaintiffs offering any Response, this Court rejected the need for any conference. The Court "found it reasonable for plaintiffs to identify in advance of the deposition the documents they expect to question Mr. Solomon about in the deposition." Exhibit C at 1 (Doc. #642). The Court further expressed its expectation that the attorneys would "behave professionally and in accordance with the letter and spirit of this Order and [its] prior rulings." *Id*. at 2.

4. Two days later, Plaintiffs did just that, sending Defense counsel a list of 17 documents that might be used in the deposition of Mr. Solomon. Exhibit D (Memo to John Ipsaro dated December 14, 2012). Thus, consistent with the Court's and counsel's expectations, Mr. Solomon was afforded Plaintiffs' work product in order to prepare for the deposition, and to allow the short deposition to operate, as Forest so strenuously argued, more "fairly" and "efficiently."

5. Yet incomprehensibly, despite Defendant's representations to the Court, despite their own arguments, despite the time the Court spent weighing in on this issue, and despite the Court's clear expectation of cooperation, Forest's counsel specifically chose not to show or allow Mr. Solomon to read <u>any</u> of these documents. In fact, Forest's counsel made it quite clear that he intentionally chose to limit what material was provided to Mr. Solomon for review prior to the deposition:

> MR. THOMAS: I will just tell you for the record we didn't give him any specific documents to review to prepare for the deposition today. I discussed with him, provided to him specific phrases, sentences and things of that nature that I had myself determined were appropriate to discuss with him. **So he wasn't provided with your documents in advance of the deposition.**

MR. VICKERY: All right. Thank you, Mr. Thomas. So what you are saying is even though I gave you a list of them by Bates number, they were not shown to the witness in advance.

MR. THOMAS: No. I didn't say he didn't have in his hands any documents at any time. I showed him what I determined -- what specific documents were important for him to look at.

MR. VICKERY: Okay.

**MR. THOMAS: But he was not given the documents to read in advance of the deposition.**

Exhibit E at 9:3-9:22.

6. Exhibit E hereto is a true and correct transcript from the one hour and three minute deposition of Mr. Solomon taken in New York on December 20, 2012. Exhibit F is a DVD that contains the video of this deposition. Mr. Solomon spent more than 12 minutes reading the only three documents Plaintiffs' presented him with. His counsel, Mr. Thomas, spent more than three minutes lecturing Plaintiffs' counsel about proper deposition procedures and questions.

7. There were several "pregnant pauses." As the video illustrates, Mr. Solomon took six minutes and 18 seconds to read his own letter of July 9, 2001, which was the very catalyst for the Court's allowance of his deposition. This is the same letter which the Court itself, correctly, assumed would be a primary focus of questioning. Frankly, it is astonishing, and a blatant disregard for the time the Court invested in this matter and its written expectations, to not, at minimum, show Mr. Solomon the very document the Court found significant. Moreover, even after reading it on the record, while the video was rolling, Mr. Solomon claimed to have no recollection of the events in question and said that he would have to reread all of the documents in order to do so:

-4-

Q. Now, rereading this letter in July of 2001, does that jog your recollection about what was going on between you and your partners at Lundbeck with regard to both Celexa and Lexapro at that point in time?

A. There's apparently some kind of a conflict. I would have to read it over more carefully and try to recollect the details of the event. There was some conflict about -- apparently, about the publication of a piece by Lundbeck.

Q. Right. Lundbeck had decided to publish and did, in fact, publish a piece in the scientific literature that included information from a study that was what you call a negative study on Celexa, right?

A. I have to reread the letter to answer that question.

Q. Okay. Well, were --

A. Be patient with me. This doesn't ring a bell. I see that I wrote it and I have a vague recollection of writing it, but I have to read it more carefully --

Q. Okay.

A. -- to answer your questions.

Q. Well, is it fair to say that Forest was upset that Lundbeck had published information?

A. It appears that we were upset because they published information which we thought was not correct.

Q. All right. And some of that information was negative efficacy information on Celexa, right?

A. I would have to go back and read the letter to answer that specific question.

Q. Was some of the information safety information?

A. If I can go back and read the letter again, I would be able to answer your question. I just read it too quickly to answer that.

Q. Okay. Well --

A. Be patient with me.

Q. I will be very patient with you. I'm sorry. I thought you would have read the letter beforehand but that's okay.

-5-

    A.    I didn't.

Exhibit E at 14:25-16:25.

8. As the Court can well see, the actions of Forests' counsel was utterly inconsistent with the arguments Forest urged the Court to adopt in order to provide Mr. Solomon Plaintiffs' work product. Any possibility that surprise or lapses in memory could be avoided, and that Mr. Solomon could summon whatever recall that he could in advance of the deposition by showing him a small subset of documents prior to his deposition, rather than "on the fly," was completely frustrated by Forests' counsel intentional decision to withhold the documents.

9. Moreover, the above deposition testimony was not an isolated instance. Another example was that Mr. Solomon took three minutes and 40 seconds to read his letter of May 2000 to the editor of New York Magazine. This letter was identified to Forest's counsel in Exhibit D in advance of the deposition. The letter was purportedly written by Mr. Solomon to address inaccuracies in the article that the magazine had published about Forest's marketing of Celexa. Mr. Solomon could not remember some basic items regarding this letter, like the fact that – as reported in the article – he read a significant quote from his son Andrew's forthcoming book on depression to the Celexa sales force at the time of the Celexa launch:

    Q.    Now, in this article -- and it's very long so I'm not going to ask you to read it now -- but in this article that you were writing to the editor, the author said that at the time that Celexa was launched you gave the following quote from your son, Andrew's, forthcoming book, "I feel sometimes as though I am swallowing my own funeral twice a day, because without these pills I would be long gone." Do you remember sharing that information?

    A.    No.

    Q.    You do know that your son, Andrew, had struggled with depression and suicidality, right?

    A.    I know that he had struggled with depression. I wasn't aware that he struggled with suicidality.

>   Q.   And in that book he says that medications that he was taking to treat the depression kept him from killing himself, didn't he?
>
>   A.   I don't remember him saying that.

Exhibit E at 24:21-25:22.

10. This exchange between Mr. Solomon and his sales staff at the very launch of Celexa is important insight into Mr. Solomon's views on antidepressant medications and the direction he was giving company personnel regarding its new antidepressant medication. And while Plaintiffs' counsel is well aware of the personal and sensitive nature of the matter, the fact that Mr. Solomon would highlight how his son's use of SSRI antidepressant medications saved his son's life is important information regarding how the company viewed its antidepressants from the top down from the very first day it ever marketed either Celexa or Lexapro in this country.

11. At this point in the deposition, counsel for Plaintiffs faced a Hobbesian choice. In the heat of the moment, we could insist that Mr. Solomon reread every document that would be presented to him,[1] and run the risk of the deposition running long, or proceed as best we could under the circumstances. Because Forest had represented to the Court that this witness necessitated reading and digesting the documents ahead of time so as to be prepared to answer questions, a mid-deposition study of the previously identified documents seemed to be a very unsatisfactory solution to the problem. Thus, per the Court's instructions, counsel decided to proceed as best he could and to take up this issue with the Court after the deposition via a motion for sanctions. Exhibit A at 5:12-5:19.

12. In the mean time, Plaintiffs' proceeded forth in the hope that, at minimum, we would get *some answers* to basic, non-document related questions, and thereby permit <u>federal

---

[1] Exhibit G is both the letter and the article and are being FILED UNDER SEAL. As the Court can see the print is quite small and the article is very lengthy. The article was disclosed to Forest's counsel prior to the deposition.

judges (rather than Forest's counsel) to decide the relevance of whatever testimony would be adduced from this witness at the time of trial. But, as the Court will shortly see, Forest's counsel thwarted that hope as well, and, as a very practical matter, usurped the prerogatives of this Court, and the transferor courts at the time of trial, by arrogating to himself the decision of what is or is not "relevant" or proper.

13. Despite the fact that Forest secured rulings from this Court limiting the time for Mr. Solomon's deposition and forcing Plaintiffs' counsel to divulge their work product, *i.e.*, those documents that he had selected for questioning, Forest's lead counsel, Joseph Thomas, made numerous improper statements and arguments throughout the one hour deposition. These statements and direction were utterly contrary to the requirements of Rule 30(c)(2) and the Court's express direction to the parties. Mr. Thomas "instructed" Mr. Solomon not to answer basic and reasonable questions. Moreover, the argumentative comments of Forest's counsel tended to be of a scolding, condescending, personal and combative nature. The following are illustrative:

> Q. Given that, let's kind of get the big picture and see if we can zoom in on that letter in a minute. What do you understand to be the gist of my client's allegations against your company?
>
> MR. THOMAS: Hold on. Look, that's not an appropriate question. Okay?
>
> MR. VICKERY: Well, then object and the judge will rule later on it.
>
> MR. THOMAS: And I will instruct him not to answer that question. You are here to make factual inquiries of this witness, you know, consistent with what we've already discussed and what we've discussed with the court. Okay? And we didn't provide him with copies of your complaints and so forth. It is just not appropriate. Okay? His opinions are not important. What he thinks about your allegations and the nature of the allegations is not important.
>
> MR. VICKERY: Thank you for the speech.
>
> Q. Mr. Solomon, would you answer my question, please.

MR. THOMAS: That's a question we shouldn't answer.

A. I'm sorry. I can't answer it.

Exhibit E at 9:24-10:23.

* * *

Q. Do you believe that the medications that your son, Andrew, took saved his life?

MR. THOMAS: Objection, form. You don't have to answer that question.

MR. VICKERY: Mr. Thomas, I didn't choose to make this matter public. Mr. Solomon did when this drug was launched.

MR. THOMAS: His personal beliefs about his son's illness have absolutely nothing to do with the factual inquiries you are making here today.

MR. VICKERY: They do if they affect his willingness to believe that this drug –

MR. THOMAS: Move on.

MR. VICKERY: -- can cause some people to commit suicide.

MR. THOMAS: Move on.

Q. Are you going to answer my question?

A. No.

* * *

Q. Mr. Solomon, are you open to the proposition that for some people, for some people, SSRI drugs can lead them to take their own lives?

MR. THOMAS: Objection to form, foundation. He's also not an expert witness. We had expert witness deadlines, reports and discovery.

MR. VICKERY: Thank you for your speech.

MR. THOMAS: He's not going to answer questions that call for expert opinions.

MR. VICKERY: It is not an expert opinion.

*Id*. at 25:23- 27:3.

    Q.       Mr. Solomon, my question was that given the success that your son has had in having his depression treated with SSRI's, which you chose to share publically and he has chosen to share publically, is it not simply impossible for you to believe that your company's SSRI drugs could cause someone else's son to take their life?

    MR. THOMAS:  We are not going to answer that question.

    Q.       Are you not going to answer that question?

    A.       No.

    Q.       Well, I'm sorry. That one is just too important to let go, so we will have to take that up. I had hoped to avoid that.

*Id*. at 31:16-32:5.

    14.      Forest chose this MDL. And, in all fairness, the people who have lost their loved ones to suicides that they believe were triggered by Forest's products are entitled to clear testimony from the CEO. More so when the CEO has personally involved himself in both proclaiming how the drugs can be lifesaving and involving himself in discussions/decisions regarding the publication of scientific data concerning these drugs. So, too, are the Judges and Juries, who will have to decide these trials on remand, entitled to clear answers to simple, straight questions. Forest's counsel's claims that Mr. Solomon's views and opinions are not relevant, and his instructions to him not to answer questions that may well be determined to be relevant by this Court or by the transferor courts at the time of the trial – especially in those circumstances where punitive damages claims are being adjudicated – completely usurps the authority and prerogatives of this Court.

    15.      It is clear from Mr. Solomon's lack of preparation and recollection that the deposition strategy was planned from the outset. Moreover, at only 45 minutes into a deposition that had a "presumptive limit" of two hours, Mr. Solomon "hoped" the deposition "isn't going to take much longer." *Id*. at 32:20-32:21.

16.     The problem at this juncture is one of remedy.  Plaintiffs' counsel was told that Mr. Solomon was only available for deposition in New York City five days before Christmas.  So we came.  And we came in good faith.  The Court ordered us to divulge our work product, for the sake of "fairness," to allow Mr. Solomon to prepare in advance, and to make the deposition more "efficient."  And so we did.  Now, after spending all of this time, money, and effort in order to obtain the testimony, we are left with a deposition that is less candid and complete than it should be.  What is the remedy that justice requires?  With respect, we ask the Court to Order the following:

   a.   Mr. Solomon to appear for a second videotaped deposition in St. Louis and in front of the Court.  The Court can then rule on any proper legal objections and can preserve videotaped testimony that can be used by all transferor courts on remand.

   b.   Mr. Solomon be ordered to prepare for that deposition in advance by reading all of the documents identified by Plaintiffs' counsel in the December 14, 2012 Memo to Mr. Ipsaro and to provide his very best recollections regarding the matters addressed by those documents during the course of the deposition.  Exhibit D.

   c.   Payment by Forest to Plaintiffs' counsel of the sum of $13,810.92 in attorney's fees and expenses for the first deposition in New York, said payment to occur within ten business days of the Court's Order.  *See* affidavit of counsel attached as Exhibit H.

   d.   And, finally, an Order that the May 2000 article from the New York Magazine be admitted into evidence at the trial of any case on remand from this MDL, and that Forest and its counsel be precluded from arguing that this article is hearsay or otherwise unreliable.

//
//
//
//
//
//
//
//
//
//

        Respectfully submitted,

        PERDUE KIDD & VICKERY

        */s/ Arnold Anderson (Andy) Vickery*
        Arnold Anderson (Andy) Vickery
        Texas Bar No. 20571800
        510 Bering Dr., Suite 550
        Houston, TX  77057-1469
        Telephone:  713-520-2500
        Facsimile:  713-520-2525
        Email:  andy@justiceseekers.com
        *Counsel for Plaintiffs*
        [Admitted *Pro Hac Vice*]

        Christopher L. Coffin, Esq.
        PENDLEY, BAUDIN & COFFIN, L.L.P.
        24110 Eden Street
        P. O. Drawer 71
        Plaquemine, LA  70764
        Telephone:  225-687-6396
        Facsimile:  225-687-6398
        *Counsel for Plaintiffs*

## Certificate of Service

I certify that on this 4th day of January, 2013, Plaintiffs' Motion for Sanctions has been electronically filed with the Clerk using the CM/ECF system, which will automatically send email notifications of such filing to the following attorneys of record:

> Joseph P. Thomas, Esq.
> John R. Ipsaro, Esq.
> ULMER & BERNE LLP
> 600 Vine St., Suite 2800
> Cincinnati, OH  45202-2409
> *Attorneys for Defendants*

        */s/ Arnold Anderson (Andy) Vickery*
        Arnold Anderson (Andy) Vickery